1
2
3
4

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

5

6

NAVREET AULAKH,

7
                           Plaintiff,

8        v.

9    CRANE WORLDWIDE LOGISTICS, LLC,

10
                           Defendant.

Case No. 2:24-cv-01151-TLF

ORDER ON DEFENDANT'S
SUMMARY JUDGMENT MOTION

11        Before the Court is Defendant Crane Worldwide Logistics LLC's ("Crane"),

12   motion for summary judgment. Dkt. 30.

13        Considering each party's briefs and the record, the Court GRANTS Defendant's

14   motion for summary judgment on the grounds that Plaintiff Navreet Aulakh has

15   presented no evidence of gender and pregnancy discrimination. This case is dismissed

16   with prejudice.

17
                              **FACTUAL BACKGROUND**

18
        A.  Crane's Employee Handbook

19
        Headquartered in Houston, Texas, Crane Worldwide Logistics, LLC operates as

20
     a full-service management for global freight shipping and contract logistics. Dkt. 33,

21
     Declaration of Perla Lopez, at ¶2.

22
23
24
25

ORDER ON DEFENDANT'S SUMMARY JUDGMENT
MOTION - 1

Crane maintains in its employee handbook an "Equal Employment Opportunity" policy stating that it is committed to providing equal opportunities to all applications and employees. Dkt. 31, Declaration of Christine Sargent, Exhibit 1 at 44.

The policy states: "We prohibit discrimination and harassment of any type without regard to race, color, religious, age, sex, national origin, disability status, genetics, protected veteran status, sexual orientation, gender identity or expression, or any other characteristic protected by federal, state, or local laws." *Id.*

Ms. Aulakh's offer letter from Crane describes the "nature of employment." It details that her employment is "at-will," which means employment is not for a specific duration and can be terminated at any time with or without cause or without notice by either herself or Crane. Dkt. 31, Exhibit 1 at 34:1-13. *See also* Dkt. 31, Exhibit 1 at 38. Ms. Aulakh testified that she did not understand this policy. *Id.* at 34:19-25.

The handbook also addresses "Severance Pay" in the event of an "involuntary termination due to a reduction in force, change in company direction or job elimination where another person is not offered or available". *See* Dkt. 31, Exhibit 1 at 103. The policy further states, "Severance payments to employees will be paid in one lump sum that is subject applicable payroll tax withholding and will require execution of a general release." *Id.*

B.  Ms. Aulakh's Employment with Crane

Crane hired Ms. Aulakh on July 18, 2023, as a Senior Export Specialist working in its Kent, Washington facility and directly reporting to Operations Manager Kent Biden ("Mr. Biden"). Dkt. 35-2, Declaration of Navreet Aulakh, at ¶1-2, 4. Ms. Aulakh's hourly wage was $33.00 per hour and averaged 34.32 hours per week. Ms. Aulakh's job duties

included: included preparing documentation, dock receipts, bills of lading, and export declarations; filing Shippers Export Declarations; tracking and tracing cargo as necessary; providing Crane's accounting department with proper and correct billing information; communicating with clients and vendors/suppliers regarding freight disposition and shipment dispatch, routing, pricing, and rates; and communicating with Crane's branches and agents for client satisfaction. Dkt 31, Exhibit 1 at 113.

C.  Ms. Aulakh's Performance at Crane

Plaintiff received a positive performance evaluation in January 19, 2024. Dkt. 35-2, Exhibit 2 at 6[1]. Mr. Biden wrote that Ms. Aulakh either "exceeded expectations" or "met expectations" in the categories of "communication with others," "initiative and creativity," "job knowledge," "judgment," "quantity and quality of work," and "reliability." Under "Developmental Comments," where Mr. Biden was asked to enter comments outlining development plans, action steps to accomplish them, and desired outcomes for Ms. Aulakh, Mr. Biden stated, in part, "I would like to see you reading e-mails in more detail." *Id.* at 34.

Crane alleges Ms. Aulakh began exhibiting poor performance as a Senior Export Specialist in early 2024. *See* Dkt. 32, Declaration of Allen Oster, at¶1-2, 6. Mr. Biden emailed Ms. Aulakh multiple times about her lack of responsiveness and mishandling of shipments. *See generally* Dkt. 31 at Exhibit 1. For example, on March 26, 2024, Fawzi Taleb, Logistics Coordinator with Crane, emailed Mr. Biden and Plaintiff to "repost [the] job to show [the] consignee code" because they were unable to "post a duty amount in

---

[1]Ms. Aulakh states in her declaration that this evaluation was dated January 19, 2024. Dkt. 35-2 at ¶5. The Court notes the evaluation itself does not appear to be dated.

the job." Dkt. 31, Exhibit 1 at 148. Ms. Aulakh responded the next day saying the file was updated. *Id.* at 147. Fawzi Taleb followed up on April 2, 2024, and April 3, 2024, after continuing to notice an issue with the consignee code. *Id.* at 145. After not receiving a response from Ms. Aulakh, Mr. Biden followed up with her on April 4, 2024, and April 8, 2024, to ask if the task was complete. *Id.*

Later that same week, Ms. Aulakh was asked to revise documents by Crane's Key Account Manager; Mr. Biden followed up with Ms. Aulakh to confirm whether that task had been completed. *Id.* at 158.

On May 1, 2024, Crane was notified that a client's shipment was missing information causing the cargo to be held at customs. On May 2, 2024, Mr. Kent emailed Ms. Aulakh, "this is getting very serious with the mistakes being made and I hope are not costly….If there is something I'm not providing you please let me know." *Id.* at 200. Mr. Kent sent emails to Allen Oster and Steve Wilkinson communicating his concerns about Ms. Aulakh's responsiveness. *Id.* at 199.

On May 10, 2024, Ryan Burns, Crane's Senior Accounting Specialist, emailed Mr. Biden and Ms. Aulakh requesting Ms. Aulakh to prepare billing packets for a client requesting invoices. *Id.* at 193. Several follow up emails were sent to Ms. Aulakh between May 10, 2024, and May 21, 2024, asking for a status update on this task. *Id.* at 190.

On May 14, 2024, Cammy Johnston, the Regional Performance Manager, emailed Ms. Aulakh asking her to fill in missing information in a spreadsheet relating to shipment departures occurring that week. After not receiving the missing information,

1    Wolfgang Meder, the District Director, and Mr. Biden followed up with Ms. Aulakh to

2    inquire if she had actioned that task. *Id.* at 188.

3        Mr. Biden wrote Ms. Aulakh on May 22, 2024: "you need to prioritize your day.

4    Please start writing tasks that need to be completed and then cross them out as you go.

5    The e-mails I'm sending out need action/response or responded to another person. This

6    isn't being done and affecting our KPI's[2]. Let me know what I can do to help." *Id.* at 195.

7        During the same month, due to Ms. Aulakh's late filing of Electronic Export

8    Information, Crane was assessed financial penalties. *Id.* at 214.

9        Ms. Aulakh acknowledges receiving "some follow up emails from Mr. Biden about

10   these delays," but states she "was able to correct the issues promptly by verbally telling

11   Mr. Biden." Dkt. 35-2 at ¶12.-13.

12       Ms. Aulakh states she verbally notified Mr. Biden that she was expecting a baby

13   in April 2024. *Id.* at ¶7. Ms. Aulakh stated she did not request any accommodations in

14   relation to her pregnancy and would be taking leave when the baby was born. Dkt. 31,

15   Exhibit 1 at 56:10-18. Ms. Aulakh testified Mr. Biden congratulated her. *Id.* at 57:6-9.

16       Crane's Leave of Absence, Family, and Medical Leave act ("FMLA") policy states

17   that "Eligible employees must submit a written request for FMLA leave to the company,

18   their manager, HR, and union that specifics the basis for need for such leave." Dkt. 31,

19   Exhibit 1 at 78. Ms. Aulakh did not submit a written request for FMLA leave for Crane.

20   Dkt. 31, Exhibit 1 at 58:4-11.

21

22

23   _____

24   [2] "Key Performance Indicators". Dkt. 31, Exhibit 1, at 116:21.

25

ORDER ON DEFENDANT'S SUMMARY JUDGMENT
MOTION - 5

In June 2024, Crane carried out a company-wide reduction in-force to address fluctuating marketing conditions that resulted in the layoffs of dozens of Crane employees globally. *See* Dkt. 33, Declaration of Perla Lopez, at ¶4.

On June 11, 2024, Ms. Aulakh was laid off as part of a reduction-in-force. Four other employees at the Kent, Washington facility were also laid off in the reduction-in-force, including three male and one non-pregnant female employee. Forty-two out of the sixty-four Crane employees that were laid off nationwide were male. *Id.* Crane Management, including Mr. Biden and Mr. Oster, were required to select employees based on performance to be included in the reduction-in-force. See Dkt. 32, Declaration of Allen Oster, at ¶3.

Ms. Aulakh was included in the layoff due to ongoing performance issues that were not improving despite multiple verbal warnings and opportunities to correct. *See id.*

The termination meeting with Ms. Aulakh took place over a phone call. Ms. Aulakh testified at her deposition that Mr. Oster and Human Resources Manager, Perla Lopez informed her that due to labor reduction, Crane was letting her go. Dkt. 31, Exhibit 1, at 81:7-11.

In her declaration, Ms. Aulakh states she was not informed her termination was as a result of a reduction in force. Dkt. 35-2 at ¶17 ("On June 11, 2024, I was terminated, effective immediately. I was NOT told it was because of performance, nor was I told it was related to a Reduction In Force.") "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir.

2009) (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ); *see also*, *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 728 (9th Cir. 1997) (describing the sham affidavit rule).

At the same time, however, the Ninth Circuit has advised that rule against such affidavits must be applied with caution. *Van Asdale*, 577 F.3d at 998. There are thus two important limitations on a district court's discretion to disregard a sham affidavit. *Id.* First, the district court must make a factual determination that the contradiction was actually a "sham"; and second, the inconsistency between the deposition testimony and subsequent affidavit must be clear and unambiguous. *Id.* at 998–99. The non-moving party is not prohibited from elaborating on or clarifying prior testimony and "minor inconsistencies that result from an honest discrepancy, mistake, or newly discovered evidence." *Id.* at 999.

Here, the court finds that both limitations are satisfied under the circumstances presented here.  Ms. Aulakh has not clarified this inconsistency, provided any other evidence from which the court could resolve the inconsistency between these statements, or provided any further evidence raising a factual dispute regarding whether she informed of the reasons for her termination. Given the state of the evidence and the absence of an explanation by Ms. Aulakh, the Court interprets the portion of Ms. Aulakh's declaration regarding whether she was informed of the reasons she was terminated on June 11, 2024, as a sham. The Court further finds that the inconsistency between her deposition testimony and subsequent declaration on this point is clear and unambiguous, and that the statement in her declaration (¶17) must be stricken as a result.

As part of her layoff, Crane offered all employees, including Ms. Aulakh, severance agreements. Ms. Aulakh was provided a Confidential Separation Agreement and Release but did not sign it.

The Confidential Separation Agreement and Release contained a non-disparagement clause. It stated, in relevant part,

> 8. Non-Disparagement. "Employee agree not to make any disparaging statements(s) to clients, customers, or suppliers of the Released Parties or to other members of the public that are: (a) knowingly false; (b) made with reckless disregard for the truth: and/or (c) are about the quality of the Company's product and made in a manner reasonably calculated to harm the Company Reputation."
>
> 12. Protected Rights. Regardless of whether or not Employee signs this Agreement, nothing in any Company agreement, policy, or practice, including this Agreement (a) limits or affects Employee's right to disclose or discuss sexual misconduct, sexual harassment or sexual assault disputes, or any other unlawful or unsafe Company conduct or practices….

See Dkt. 35, Exhibit 1, at 139-143.

The agreement also included a "State Specific Addendum to Separation Agreement and Release Applicable to Individuals Who Lived Or Worked in The Following State." See id. at 144. This addendum stated:

> 1. WASHINGTON. If during employment with the Company, Employee lived or worked in the State of Washington, the following is added to the protected rights section: Regardless of whether or not Employee signs this Agreement, nothing in any Company agreement, policy, or practice, including this Agreement prevents Employee from discussing or disclosing conduct, or the existence of a settlement involving conduct, that Employee reasonably believed to be illegal discrimination, illegal harassment, illegal retaliation, a wage and hour violation, or sexual assault, or that is recognized as illegal under state, federal, or common law, or that is recognized as against a clear mandate of public policy, where the conduct occurred at the workplace, at work-related events coordinated by or through the employer, between employees, or between an employer and

an employee, whether on or off the employment premises; provided, however, that Employee remains subject to the obligation to keep confidential the amount paid in settlement of any claim.

Ms. Aulakh contends that she was not laid off as part of a reduction in force but rather because of her pregnancy as Crane hired two new employees to replace her, or they hired two new employees before they terminated her. Dkt. 35-2 at ¶9. The employees that Ms. Aulakh identified were temporary employees and not permanent employees. Dkt. 35-2 at 12. Since the reduction-in-force in June 2024, no one else at the Kent facility has held her title at Crane. *See* Dkt. 33, Declaration of Perla Lopez, at ¶5.

On July 5, 2024, Ms. Aulakh filed her complaint in King County Superior Court alleging state law claims. Dkt. 1. Crane removed the case to this Court on July 30, 2024, based on diversity of citizenship. *Id.* Ms. Aulakh filed an Amended Complaint on February 6, 2025, asserting the following causes of action arising out of her termination at Crane: (1) Gender and Pregnancy Discrimination under the Washington Law Against Discrimination (WLAD); (2) Wrongful Termination, and (3) Silenced No More Act violations[3]. Dkt. 22.

## DISCUSSION
### A. Summary Judgment Standard

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[3] In her response to Crane's summary judgment motion, Ms. Aulakh appears to allege Crane violated the federal Worker Adjustment and Retraining Notification Act of 1988 ("WARN Act"). Dkt. 35 at 3. "It is impermissible to add a new claim or assert a new legal theory for the first time at the summary judgment stage." *Echlin v. PeaceHealth*, 887 F.3d 967, 977-78 (9th Cir. 2018). Because Ms. Aulakh did not raise a claim under the WARN Act in her amended complaint, the Court will not address Ms. Aulakh's allegation that Crane violated the WARN Act in this Order.

matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 32); *see also* Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. In such a circumstance, summary judgment should "be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968). Thus, the "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

"In evaluating the evidence to determine whether there is a genuine issue of fact, [the court] draw[s] all inferences supported by the evidence in favor of the non-moving party." *Walls v. Cent. Contra Costa Transit Auth.,* 653 F.3d 963, 966 (9th Cir. 2011) (citation omitted). It is the opposing party's obligation to produce a factual predicate from

which the inference may be drawn. *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank*, 391 U.S. at 289).

**B. Requests for Admission**

When Requests for Admission are served, "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Fed. R. Civ. P. 36(a)(3). Failure to respond thus results in the matters being deemed admitted and precludes the existence of a genuine issue as to that matter, which supports summary judgment. *See Ocasio v. Las Vegas Metropolitan Police Dept.*, 10 Fed. Appx. 471 (9th Cir. 2001) ("Because Ocasio failed to respond to defendant's requests for admissions, the district court properly deemed the matters admitted pursuant to Fed. R. Civ. P. 36(a) and, in the absence of any disputed issues of material fact, properly granted summary judgment."). If no other genuine disputes of material fact exist in the case, summary judgment is appropriate.

On February 12, 2025, Crane served Ms. Aulakh with Requests for Admissions via email and mail. Dkt. 31 at Exhibit 2. Ms. Aulakh's responses to the Requests for Admissions were due March 14, 2025, under FRCP 36. To date, Ms. Aulakh has not responded to the Requests for Admissions. Dkt. 31 at ¶ 4. Given Ms. Aulakh's failure to respond, the Requests for Admissions are deemed admitted under FRCP 36.

Although Ms. Aulakh filed a response to the summary judgment motion, the response did not address the Requests for Admission. Ms. Aulakh has also not moved to withdraw or amend her admissions pursuant to FRCP 36(b).

Ms. Aulakh's nonresponse results in the admissions that: (1) Mr. Biden had followed up with Ms. Aulakh repeatedly following her failure to respond to emails and her failure to properly submit certain documentation; (2) Crane was assessed for penalties in May 2024; (3) Ms. Aulakh was laid off from Crane due to a nationwide reduction-in-force; (3) Ms. Aulakh was offered a severance package; (5) Ms. Aulakh received the severance agreement with the Washington Addendum; (6) individuals that did not identify as females or pregnant were included in the reduction-in-force in June 2024; (7) Ms. Aulakh was not terminated because of her pregnancy or gender. *See* Dkt. 31 at Exhibit 2.

As discussed further below, Court finds no other genuine disputes of material fact exist in this case, and therefore, summary judgment is appropriate.

**C.  Washington Law Against Discrimination (WLAD)**

The WLAD was enacted to protect state inhabitants from practices of discrimination. RCW 49.60.010. The WLAD states that "it is an unfair practice for any employer to discharge or bar any person from employment because of ... sex. RCW 49.60.180(2)." Under RCW 49.60.180, an employee in a protected class has a cause of action for a discriminatory discharge from employment.

Since there will rarely be direct evidence of discrimination, discrimination claims are often considered under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792(1973). *See Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas*

1  *Cnty.*, 189 Wash.2d 516 (2017) (applying *McDonnell Douglas* framework to claims

2  under the WLAD).

3      Under *McDonnell Douglas*, a plaintiff bears the initial burden of establishing a prima

4  facie case by raising an inference of discrimination—a "presumption that the employer

5  unlawfully discriminated against the employee." *Tex. Dep't of Cmty. Affairs v. Burdine*,

6  450 U.S. 248, 253– 54 (1981).

7      A prima facie case of gender discrimination alleging disparate treatment has four

8  elements: 1) the employee is a member of a protected class; 2) the employee is

9  qualified for the employment position or performing substantially equal work; 3) the

10  employee suffered an adverse employment action; and 4) similarly situated employees

11  not in plaintiff's class received more favorable treatment. *See Kang v. U. Lim Am., Inc.*,

12  296 F.3d 810, 818 (9th Cir. 2002); *Davis v. West One Auto. Grp.*, 140 Wash.App 449,

13  459 (2007). After this prima facie case is made, an inference of discrimination arises,

14  and the burden "then shifts to the defendant to articulate a legitimate nondiscriminatory

15  reason for its employment decision." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th

16  Cir. 1994) (quoting *Lowe v. City of Monrovia*, 775 F.2d 998, 1005 (9th Cir. 1985), *as*

17  *amended*, 784 F.2d 1407 (1986)).

18      If the defendant succeeds in articulating a legitimate nondiscriminatory reason, then

19  to defeat summary judgment, the plaintiff must demonstrate that the "articulated reason

20  is a pretext for unlawful discrimination by 'either directly persuading the court that a

21  discriminatory reason more likely motivated the employer or indirectly by showing that

22  the employer's proffered explanation is unworthy of credence.'" *Aragon v. Republic*

23  *Silver State Disposal, Ind.*, 292 F.3d 654, 658–59 (9th Cir. 2002) (quoting *Chuang v.*

24

25

ORDER ON DEFENDANT'S SUMMARY JUDGMENT
MOTION - 14

*Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quotations and citation

omitted). "Although intermediate burdens shift back and forth under this framework,

'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143(2000) (quoting *Texas Dept. of*

*Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

i.    **Plaintiff's Prima Facie Case**

The parties do not contest Ms. Aulakh, a woman who was pregnant at the time of

her termination, is a member of a protected class, she was qualified for her role at the

time she was hired, or that she experienced an adverse employment action when she

was terminated from her employment. The parties dispute whether Ms. Aulakh

performed her job satisfactorily and whether she was treated less favorably than

similarly-situated male or non-pregnant female employees.

Ms. Aulakh submitted her January 19, 2024, evaluation written, in part, by Mr. Biden

to show her work was satisfactory. In that evaluation, Mr. Biden opined that Ms. Aulakh

either exceeded expectations or met expectations for each performance competency

category. He stated, for example, Ms. Aulakh was "very approachable," "extremely

involved with all aspects of her job," and "shows an understanding of the business and

shows a good common-sense approach to making timely decisions." Dkt. 35-2, Exhibit

2, at 6-9.

Ms. Aulakh acknowledges Mr. Biden emailed her with task-related questions and

had to follow up with her on some occasions, but argues the issues raised by Mr. Biden

were typically resolved verbally because Mr. Biden and Ms. Aulakh sat in adjacent

terminals at work. Dkt. 35 at ¶12-13.

Crane submitted evidence that Ms. Aulakh's work was not satisfactory, including

several email correspondences where Mr. Biden, other Crane employees, and clients

had to follow up with Ms. Aulakh to receive answers to their questions and status

updates on tasks assigned to her.

Despite the evidence presented by Crane, Ms. Aulakh has provided some evidence

that she received satisfactory job ratings prior to her termination.

With respect to the last factor, Ms. Aulakh did not proffer evidence that similarly

situated employees not in Ms. Aulakh's class (i.e., male, or non-pregnant female

employees) received more favorable treatment. Ms. Aulakh did not provide evidence,

for instance, that she was singled out by Mr. Biden or other Crane employees for her

performance when other male employees were not subjected to the same expectations.

She also failed to show that the other individuals terminated from the Kent facility in

June as a result of the reduction-in-force were not male or non-pregnant employees.

Ms. Aulakh only argues she was asked to train two employees to replace her while

she was on leave. This, however, does not demonstrate that similarly situated male

employees or non-pregnant female employees received more favorable treatment.

The undisputed facts do not support a prima facie case for discrimination based on

Ms. Aulakh's sex or pregnancy. But the Court will also discuss the issues in the case by

assuming (but not deciding), for purposes of analysis, Ms. Aulakh has presented a

prima facie case for discriminatory discharge.

1

**ii.    Nondiscriminatory Reason for the Adverse Action**

The record establishes Crane had legitimate business reasons for Ms. Aulakh's termination. Crane has shown that Ms. Aulakh's position was eliminated as part of a force reduction wherein three male employees and one non-pregnant female employee were laid off from the Kent facility, and a total of 42 out of the 64 employees who were laid off nationwide were male. A force reduction is a legitimate, non-discriminatory reason for termination under WLAD. *See Shokri v. Boeing Co.*, 311 F. Supp. 3d 1204, 1212–13 (W.D. Wash. 2018), *aff'd*, 777 F. App'x 886 (9th Cir. 2019).

Defendant also offers legitimate reasons for Ms. Aulakh's job performance in the assessment for the force reduction. For this stage in the *McDonnell Douglas* framework, the employer only has a burden of production, not persuasion, and does not need to persuade the court that it was actually motivated by the nondiscriminatory reasons. *See Mikkelsen*, 189 Wash.2d at 533. The employer need only introduce "'evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.'" *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

Thus, Crane has satisfied its burden of showing it had a legitimate business reason for Ms. Aulakh's termination.

**iii.    Pretext**

In the third and final step of the *McDonnell Douglas* framework, the burden shifts back to the employee to produce sufficient evidence to establish a question of fact as to pretext: that the employer's alleged nondiscriminatory reason for the adverse employment action was pretextual or that even if the stated reason was legitimate,

1   discrimination, retaliation, or violation of public policy also was a substantial motivating

2   factor. *See Mikkelsen*, 189 Wash.2d at 527.

3       The Court concludes Ms. Aulakh did not present sufficient evidence to create a

4   genuine issue of material fact regarding this step.

5       As discussed above, Crane has produced a legitimate, non-discriminatory

6   explanation for why Ms. Aulakh was terminated: during a national reduction in force that

7   eliminated positions nationwide, Ms. Aulakh was selected for termination. Ms. Aulakh

8   must show that this explanation is pretext for Defendant's discriminatory decision. A

9   plaintiff may rely on direct evidence which proves discriminatory animus on its own—

10  typically clearly discriminatory statements or actions—or circumstantial evidence which

11  "requires an additional inferential step to demonstrate discrimination." *Coghlan v.*

12  *American Seafoods Co. LLC*, 413 F.3d 1090, 1095 (9th Cir. 2005). " '[V]ery little' direct

13  evidence of [a] discriminatory motive is sufficient." *Winarto v. Toshiba America Elecs.*

14  *Components, Inc.*, 274 F.3d 1276, 1284 (9th Cir. 2001). But where circumstantial

15  evidence is used, "a plaintiff must put forward specific and substantial evidence

16  challenging the credibility of the employer's motives." *Vasquez v. Cnty. of Los Angeles*,

17  349 F.3d 634, 641 (9th Cir. 2003) (citations omitted).

18      Ms. Aulakh asserts that Crane could not have implemented the reduction in force

19  because Crane hired two new employees that she was asked to train. The employees

20  Ms. Aulakh identified were temporary employees, not permanent employees, and were

21  hired to provide coverage for when Ms. Aulakh would be on leave. Ms. Aulakh's position

22  was not filled by a permanent employee and has not been filled with any employee to

23

24

25

date. Ms. Aulakh provided no evidence to show Crane was biased in favor of male employees or non-pregnant female employees.

Ms. Aulakh has not provided specific or substantial enough evidence for a jury to decide that Crane's explanation for her termination was pretextual, and therefore Crane's motion for summary judgment on Ms. Aulakh's WLAD claim is GRANTED.

**D. Wrongful Termination**

Crane next moves for summary judgment with respect to Ms. Aulakh's claim for wrongful termination.

Generally, employment in Washington State may be terminated at will by either employee or employer. *See Norvell v. BNSF Ry. Co.*, No. C17-5683 BHS, 2018 WL 263312, at *3 (W.D. Wash. Jan. 2, 2018); *see also Ford v. Trendwest Resorts, Inc.*, 146 Wash.2d 146, 152 (2002) ("In Washington, the general rule is that an employer can discharge an at-will employee for no cause, good cause or even cause morally wrong without fear of liability." (citation omitted)). However, "[o]ne narrow exception to the general at-will employment rule prohibits an employer from discharging an employee 'when the termination would frustrate a clear manifestation of public policy.'" *Norvell*, 2018 WL 263312, at *3 (quoting *Roe v. TeleTech Customer Cage Mgmt. (Colorado)*, 171 Wash.2d 736, 755 (2011)).

"The tort for wrongful discharge in violation of public policy is a narrow exception to the at-will doctrine." *Becker v. Cmty. Health Sys., Inc.*, 184 Wash.2d 252, 359 P.3d 746, 749 (2015). Plaintiff must demonstrate that her discharge "contravenes a clear mandate of public policy." *Thompson v. St. Regis Paper Co.*, 102 Wash.2d 219 (1984). The

1  Washington Supreme Court has stated that "courts should proceed cautiously if called

2  upon to declare public policy." *Id.* at 1089.

3      A dismissal violates a clear mandate of public policy if it falls into the following four

4  categories: (1) where employees are fired for refusing to commit an illegal act; (2) where

5  employees are fired for performing a public duty or obligation, such as serving jury duty;

6  (3) where employees are fired for exercising a legal right or privilege, such as filing

7  workers' compensation claims; and (4) where employees are fired in retaliation for

8  reporting employer misconduct, i.e., whistleblowing. *Gardner v. Loomis Armored Inc.*,

9  128 Wash.2d 931 (1996).

10      Ms. Aulakh does not identify which category her case would fit. Ms. Aulakh has not

11  shown the existence of a genuine issue of fact regarding whether she was discharged

12  because of any protected conduct. As set forth above, Crane has shown that it had a

13  legitimate, non-discriminatory reason for its actions, and Ms. Aulakh has not provided

14  any evidence of pretext. Accordingly, her public policy claim fails as a matter of law and

15  Crane's motion for summary judgment on Ms. Aulakh's wrongful termination claim is

16  GRANTED.

17  **E.  Silence No More Act Claim**

18      Under Washington State's Silence No More Act states "[a] provision in an agreement

19  by an employer and an employee not to disclose or discuss conduct… the employee

20  reasonably believed under Washington state, federal, or common law to be illegal

21  discrimination, illegal harassment, illegal retaliation … is recognized as against a clear

22  mandate of public policy, is void and unenforceable." RCW 49.44.211(1).

23

24

25

Ms. Aulakh argues that a "layperson" like herself is not likely to understand the language in non-disparagement language in the Agreement. Dkt. 35 at 4. Ms. Aulakh alleges that because the plain language of the non-disparagement provision violates the Silenced No More Act.

The non-disparagement provision in the Agreement is sufficiently limited and narrow in scope under the Silence No More Act because it only restricts disparaging statements that are: "(1) knowingly false, (b) made with reckless disregard for the truth; and/or (c) are about the quality of the Company products and made in a manner reasonably calculated to harm the Company's reputation." Further, the Agreement and the addendum contain language expressly telling an individual, including Ms. Aulakh, about their "right to disclose or discuss sexual misconduct, sexual harassment or sexual assault disputes, or any other unlawful or unsafe Company conduct or practices."

The Court finds no genuine issue of material fact exists that Crane's Agreement complied with the Act, and Ms. Aulakh's claim under the Silenced No More Act is dismissed.

In sum, the Court concludes Crane has carried their burden to show that there is no genuine dispute of material fact as to any of the plaintiff's claims. Thus, because Ms. Aulakh does not present sufficient evidence that a reasonable jury could return a verdict for the nonmoving party Crane is entitled to judgment as a matter of law.

The court therefore GRANTS Crane's motion for summary judgment.

//

//

//

1

**CONCLUSION**

2        The Court GRANTS Defendant's motion for summary judgment. This case is

3  dismissed with prejudice. The Clerk is instructed to close the case.

4        Dated this 2nd Day of July, 2025.

5

6                                         Theresa L. Fricke
                                          United States Magistrate Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25